Good morning, Ms. Lund. Good morning. Can you hear me, Your Honors? We sure can. Judge Graber, are you able to hear? Yes, I hear fine. Thank you. Okay. We'll begin with counsel for appellant. Good morning. Good morning, Your Honors. May it please the Court, Susanna Lund for Plaintiff Appellant Eric Lund. I plan to reserve two minutes for rebuttal and will watch my clock. The briefing in this matter is dense. So unless the Court would like to focus elsewhere, I intend to address the following three points this morning. One, the sua sponte procedural error that requires reversal of summary judgment on the unreasonable seizure claims. Two, the substantive justification for the seizure that rested entirely on what the forensic science community would call junk science and what this Court's precedents would call evidence lacking any indicia of reliability. And three, the fact that deference must have a source, either legislative or judicial. And when a defendant cannot point to an applicable source, the default constitutional standard must apply. So point one, the district court's most consequential error was its sua sponte grant of summary judgment to defendants on the unreasonable seizure claims. The Court's analysis began correctly. It found that the circumstances of Mr. Lund's 66-day segregation and solitary confinement presented an atypical and significant hardship that triggered his Fourth Amendment rights under Resnick v. Hayes. But then, after correctly opening the constitutional door, the Court granted summary judgment to the defendants on a ground that they never even raised in their motion, that the seizure was reasonable as a matter of law. Well, can I — So were the facts disputed concerning what happened? Yes. In what relevant respect pertains to the reasonableness of dealing with a person suspected of having drugs in the prison? So specifically, the timeline of events. So as to the — so the sua sponte decision came on the Fourth Amendment claim. So defendants only raised the argument that convicted prisoners do not have Fourth Amendment right to be free from bodily seizure at all as a matter of law, and then qualified immunity. They did not dispute the facts. Well, that's my point, Agnes. If there are undisputed facts that make the actions reasonable, why is the district court precluded from making that conclusion if you don't dispute the facts? So I think it's actually in reverse, Your Honor. They did not dispute plaintiff's facts that show unreasonableness as a matter of law. Well, your conclusion of unreasonableness rests on facts. I'm talking about what happened. There was an envelope. It had a stain. Those sorts of facts. I don't see that those are disputed. So the entire timeline is disputed. This supposed April 28th starting point when an unidentified mailroom employee flagged a letter is untested hearsay. There's no contemporaneous log or witness, anything that can be cross-examined. It's in practical terms, it's a ghost story, and it was error to treat that as the linchpin of the timeline. By contrast, the first event for which there is admissible evidence. So looking at her, Officer Murphy's declaration, the first event where she has personal knowledge of stating when she did something. So her declaration at 8 ER 2124 is May 4th when she seized Mr. Len's legal mail. During which time she told her that she was taking his legal mail, she chose to proceed anyway, and only after that May 4th verbal notice and after his grievance on May 10th and after his attorney's internal affairs complaint on the 19th did Murphy write her rules violation report on May 28th, introducing the April 28th timeline for the first time. And that post hoc RVR narrative is impossible to square with the documentary evidence. The RVR claims that she weighed and photographed the greeting card before she nit-tested it, and then she signed, sealed, and booked that card into evidence and that all of these things happened before she entered Mr. Len's dorm on May 4th and took his legal mail. But Ms. Lund, I guess the, so are you disputing in the Murphy declaration as well as in the report that the test took place on April 28th or before the search? Yes, because the photographs that Officer Murphy personally admits that she personally took are dated May 20th. Well, but that doesn't necessarily tell us, I mean, so I think Officer Murphy's declaration, it's admissible. I'm not sure that there's, it would be admissible at a trial that she testified. There's no need for corroboration, right? I think the non-movements burden here is to establish some competing fact rather than a conjecture about this. It's, I mean, is there any other fact we should look for that suggests that the search was motivated by anything else? I don't think it's disputed that Officer Murphy did not know Mr. Lund prior to this discussion. What else could have precipitated the search other than the test? Well, first to begin with, Your Honor, the fact that there is this dispute of timeline is precisely the credibility. Well, what dispute of timeline, I guess we're asking, where are the facts on the other side that would manufacture a genuine dispute of those material facts? Okay. So the photographs that she says she took before May 4th are actually dated May 20th. The booking that she said occurred before May 4th, all states that it, the envelopes are dated by her on May 21st. So the 20th and 21st are dates that immediately precede this cascade of protected conduct that she, that Mr. Lund engaged in. So what is your theory that she just indiscriminately searched his bunk for no reason? It is a completely plausible theory because it happens every day in prisons. And legal mail was taken from that bunk for whatever reason. It is entirely possible that the jury could completely agree that it was taken for the purpose of a drug investigation. They could also find that it was for some other purpose. They don't need to find it was for some other purpose, however, because the escalation of the adverse action only happened after the protected conduct ensued. What's the response that essentially the officers had no discretion under prison policy that once they'd had a positive test and it had met and there was a history, I understand that it was Mr. Lund's mother, but there was a history of it that it met the elements of the policy that there was, there's no room for them to retaliate or to act unreasonably because that's what they had to do. Okay. So first to the premise that there was a positive on the test is disputed and we can address that later if you would like. But as to the evidentiary issues, Mr. Lund made specific rule 56C2 objections to the competence of both the memorandum and the party, the three witness declarations about quote, unquote CDCR policy, arguing that the evidence was hearsay, lack foundation authentication was irrelevant to the facts of the case. And even if truly given force and effect by the agency amounted to unlawful underground regulations under California law, rule 56 only allows a court to consider material that can be presented in an admissible form at trial. And once Mr. Lund objected under 56C2, the burden shifted to the defendants to show the admissibility or explain the admissible form that they anticipated. They never did so. And without ruling on those objections, the court relied squarely on this disputed evidence about policy to find the seizure reasonable as a matter of law. That was error that was not harmless because one, the objections are meritorious, they should have been sustained. And once that inadmissible policy is stripped out of the record, there is at least a genuine dispute of fact on whether the seizure was reasonable. But in terms of why it might not be, I understood your brief to be focused on this theory of deliberate fabrication. Is that your theory? That was a theory. So when there are cross motions for summary judgment, each motion must stand on its own. We marshaled one theory that we thought could get us over the line of summary judgment as a matter of law and preserved a significant amount of evidence that could dispute reasonableness, but they never raised it in their brief. So we strategically preserved that for trial. We had no obligation to preemptively rebut a theory they never raised. So we asserted one theory of deliberate fabrication that did not require us to throw all of our cards out on the table of an unreasonableness when that issue wasn't even in dispute by the opposing party. So what is your best theory on why this was unreasonable? As a matter of law? As a matter of law or fact? As a matter of law, the best theory is deliberate fabrication. The reporting a presumptive, excuse me, the NIC test K by its instructions that Officer Murphy admits that she was trained on, that were hanging in her office at the time, expressly require that a NIC test K, if morphine is known to be present, would present as a biphasic reaction. First we would see a blue-green color reaction that then shifts to a gray color reaction. And Officer Murphy testified that she saw one color, not two, and it was dark purple, not blue-green or gray. And under this court's holding in Spencer v. Peters, misrepresenting the underlying evidence to report a false result that then results in a deprivation of liberty for somebody is direct evidence of deliberate fabrication. But I guess the deliberate seems to be the question there. I mean, I think Officer Murphy testified as to what she saw at the time. The dispute may be about whether that was enough or whether it was misinterpreted. But how is that enough to show that particularly where it seems like Officer Murphy is standing by her story, that that was the color that it turned. Now, you may say she misread it, but that's not the same as deliberate fabrication. So, well, so that was the position that the district court took in stating that gray was close enough to dark purple to kind of not infer misconduct there, a deliberate fabrication. But the critical element is that unlike several other of the NIC tests, which only require a single color change, the NIC test K, and this is at 6 ER 1492, shows that the NIC test K for morphine is unique. It requires a color shift. You have- I have a question about that. In the BACA deposition, this is, I think it's, no, maybe it's trying to remember if it's Miller or BACA, that deal that talks about a blue-green color changing to gray indicates morphine. But then the BACA deposition says, when color screens are only presumptive, not confirmatory, there are several substances that could give a potential screening, say, purple, and it doesn't necessarily mean there's a controlled substance. So that- doesn't that suggest that sort of corroborating that purple, even if that's what was seen, could indicate a controlled substance? Your Honor, the senior criminalist at the DOJ, Alison BACA, was not referring to any particular reagent when she was making that testimony. She definitely was not referring to the NIC test K. And each reagent in these ampules of the product react in different ways with the molecular structure of the component that's being- or the components on the molecular structure that is being tested. And so, Alison BACA also testified that she absolutely would not ever use calorimetric chemistry to identify a substance, and that it's only useful in a laboratory setting for helping a chemist determine how to most efficiently extract a substance for the proper testing, the GC-MS gas chromatograph mass spectrometry, which is what can identify. So, this- the purple is- So, is it your- is it your view that there's no sort of on-the-spot testing that would ever be reasonable to allow the prison to deal with an individual who's believed potentially to have drugs? As to these field chemical drug tests, on their own, no, they are not. They are unreliable. As the amicus brief details and as the Safari Land testimony and Alison BACA testimony confirm in the record, these are not reliable. They were not- the limitations of the chemistry is that it is impossible to identify a substance. They can merely classify, and they can be triggered by flour and coffee sweetener and cheese and chili powder and all these other innocuous household substances. The limitations of the chemistry make them lack an indicia of reliability sufficient to take some sort of serious sanction against a prisoner. Now, to your question about is there anything on the spot, certainly there is. It's not in the record. It's referred to in the amicus brief. There are other portable devices that are much more accurate. Mass spectrometry. We've let you go a little over your time. I'll give you time for rebuttal. I had one more question before we hear from your opposing counsel, which is, what is the relief that you're- that you believe you're entitled to in this case? What are you thinking? At a very minimum, reversal of all grants of summary judgment to both defendants and- I understand that, but ultimately, what do you believe- what are you seeking in this case? Ultimately, plaintiff's motion for partial summary judgment against Murphy on the retaliation claim and both unreasonable seizure claims should be granted. The trial should be remanded for trial against Murphy on Rhodes Factor II liability. What are you asking for? Money or some other kind of relief? What do you believe you're entitled to? What do you believe you're entitled to for this situation?  Okay. Damages. And your honor, there is the Bain Act claim that does allow for creative crafting of injunctive relief that the court may deem warranted to stem injustices. Is your client still incarcerated? He is not. Okay. Thank you. We'll put two minutes on the clock for rebuttal since we've let you go a little over here, but let's hear from the state. Good morning and may it please the court. Haley Amster for Appellees. We've heard some discussion this morning about conflicting dates and timelines, but as the district court correctly explained, Officer Murphy's investigation into Mr. Lund began well before he ever filed a grievance. Officer Murphy didn't know Mr. Lund and she had never met him before. And after a full opportunity for discovery, Mr. Lund was unable at summary judgment to show any evidence of fabrication or retaliation. Mr. Lund's other claims fail as a legal matter. His transfer from dorm housing to administrative segregation was not a seizure for Fourth Amendment purposes. And on Mr. Lund's challenge to the jury instructions, the district court correctly stated the law. So let's just go back to the first point. So opposing counsel referenced some of the late May dates on some of the documents. So what's your response to that? So on that point, I would recommend that the court look at Officer Murphy's deposition testimony on that point, which is at volume five of the excerpts of record at page 1188. So when Officer Murphy was asked about these states and her deposition, she explained that the dates on the placards and those photographs correspond to the dates that she was completing her report in this case. But as she went on to explain, she took other photographs over the course of this investigation, including of Mr. Lund's bunk and the NIK test that she performed in this case, but that they didn't make it onto the final report in the case. Are those in the record? They're not, Your Honor. But I'll also note that Officer Davis, Officer Murphy's supervisor was also asked about this in his deposition. And he explained that it's perfectly normal for officers to take anywhere from 50, 60 photos over the course of an investigation. But they whittled down that number to just a handful that get attached to the final report. Your opposing counsel also focused on just the manner of the proceedings in the district court in terms of what your client, the basis that your client moved for summary judgment on the seizure claim and then the ground on which you ended up prevailing. And do you want to address this issue? Sure, Your Honor. So on that claim, which I understand to be about the Fourth Amendment claim in particular, the parties cross moved on that claim. And my understanding is that Mr. Lund's motion put reasonableness at issue. And so it wasn't improper for the district court to decide reasonableness at summary judgment. I'd like to ask you to focus on reasonableness and explain why, in your view, everything that happened was reasonable. And I want you to assume, for the purpose of this question, that Resnick permits a Fourth Amendment claim in certain circumstances. Certainly, Your Honor. So, of course, our position in this case is that there was no seizure for Fourth Amendment purposes, but addressing just the reasonableness. Mr. Lund's argument, primary argument on this point was that there was evidence of fabrication or retaliation. On that point, I would, again, recommend that the court read the relevant two pages of Officer Murphy's deposition testimony, which is at volume five of the excerpts of record at pages 1163 to 1164. And I think that if the court reads those pages directly, you'll see that it can't support any inference of fabrication or retaliation. I'm happy to walk through those two pages if it would be helpful. Sure. So Mr. Lund's argument is twofold. First, he's saying that Officer Murphy's testimony was that there was no biphasic reaction in this case. And from that, I understand it to be that an NIK test turns one color first, and then it transitions into a second color. And that second color is the one that corresponds to a particular narcotic. But if you look at the question that she was asked, it was phrased in the singular. She was asked, what color change did you observe when you tested Mr. Lund's mail? And in response to that, Officer Murphy says she saw the one for morphine. Now, she answered a question phrased in the singular, and she wasn't asked any clarifying questions about, is your testimony that you never saw a second color? You only ever saw one color pop up on this test. So I don't think that that can be fairly read to say that there was no biphasic reaction ever seen. The second part of Mr. Lund's argument has to do with this dark gray versus purple issue. And on that, Officer Murphy was asked what color she meant when she said the one for morphine. And she said she couldn't recall off the top of her head, so she asked to reference the chart that comes with the NIK test. And addressing in particular one question that Judge Johnstone asked earlier, I want to clarify that her testimony on this was that she was looking at that chart in her deposition and explaining what she meant, like that color was for morphine, looking at that chart in her deposition. She wasn't saying what she recalled at the time when she did the test. She said she couldn't recall what color corresponded to morphine. So I read that testimony to say that she was sitting in her deposition at that present moment, describing what she saw on the chart as corresponding to morphine. She described that as dark purple. Even if Mr. Lund disagrees, and he would personally describe that color on the chart as gray, I don't think that that supports any evidence that she fabricated the test in this case. How about just the general reliability of this test for detecting morphine? I think that the reliability of the NIK test has limited relevance, if any, to this claim. The record here shows that there was a false positive this one time. We don't have a broader view into the reliability of NIK testing in general. And instead, we have an officer that was trained to use this particular test. It wasn't in her discretion to send this to a chemist for testing in the first instance. It also wasn't in her discretion to drop the investigation entirely. So as to the reasonableness of this officer's conduct, any objectively reasonable officer under these circumstances would have followed their training and used this test. What about the... Counsel, I have a further question. I'm sorry, I didn't mean to interrupt. Go ahead, Judge Graver, please. I wanted to follow up on the issue of the general reliability of the test. If the procedure, and this will be a far-fetched example, but if the procedure called for the officer to sniff the envelope, and if it smelled funny, that would, you know, trigger certain required actions. What is the threshold? How do we know and can we take judicial notice of the reliability or unreliability of the method that was chosen? On that, Mr. Lund ultimately bore the burden of proof on his claim, which is that he was seized for purposes of the Fourth Amendment and that the seizure was unreasonable. I don't think that he has put evidence in the record that would allow us to infer that NIK tests as a whole are so unreliable that it would be unreasonable for this particular officer to rely on it such that her use of this test would constitute an individual constitutional violation that she would be responsible for damaging. So half of my question, though, had to do with judicial notice. Is that an appropriate thing for us to nose into to figure out if this is so wildly unreliable that nobody could possibly pay attention to it? I respectfully disagree, Your Honor, that the court should take judicial notice of any facts about the reliability of the NIK test because I don't think that it's relevant to this officer's conduct. The question here on reasonableness is what an objectively reasonable officer would do under these circumstances. And I don't think that an objectively reasonable officer who was trained to use this particular test would have been able to do anything else. She wouldn't have had the discretion to simply choose not to use this particular NIK test. And so I don't think that it factors into this analysis. What do we do about the delay? It's not entirely clear that this is part of Mr. Lund's argument, but you do point out that once you get past the grievance and the conclusion of the investigation, the confirmatory test takes an awful long time, given that everyone understands that this is simply a preliminary test at best. And that whole time he's in administrative segregation. So what are we to make of that with respect to it? That would happen after the grievance and everything else. That chain of causation is a little more likely if it's problematic. How do you explain it? I don't think that any delay between confirmatory testing and the initial NIK test would render the use of that initial test unreasonable. For example, it's very common for people to choose to use something like an at-home rapid COVID test instead of going into a doctor's office for a swab and waiting for confirmation on that. I don't think it would be unreasonable under these circumstances to use these cheaper, rapid versions of these tests. Right, but to wait quite so long before the confirmatory test, after imposing discipline, or set aside the discipline after relocating the prisoner? I respectfully disagree that there was any sort of unusual delay in this case. And I'll also note that the investigation in this case happened at the height of COVID in May, June of 2020. And all of the prisons were short-staffed and had additional duties beyond the ordinary scope of their duties. So it took additional time in this case to get some sort of lab confirmation from the chemist who tested this. But I wouldn't say that that delay is meaningful to this analysis in any way. If I could briefly address the jury instruction issue in this case. So turning to the jury instructions, under any standard of review, Mr. Lund's challenge to the jury instructions fails. The district court didn't get the law wrong. A consideration of the legitimate, penological purposes or justifications is a necessary part of evaluating any inmate's constitutional claim. And the language that was put to the jury here, legitimate, penological purposes or justifications, is not meaningfully different from any other formulation that this court has affirmed. In particular, the legitimate correctional interest formulation that this court affirmed in Bell v. Williams. Including language along those lines is also not as a formal matter, the same thing as instructing the jury to apply Turner deference as a formal matter. And in addition, Mr. Lund hasn't met any burden to show that there would have been harmless in this case. If there aren't any further questions, I'll wrap up. It appears there's not. So do you have any concluding remarks? We ask the court to affirm the judgment below. Thank you. Thank you. And we'll now hear rebuttal.  Okay, a few quick points I'll just hit real quick. First of all, Resnick v. Hayes rejected the proposition that incarcerated prisoners have been stripped of their Fourth Amendment right to not have their bodies unreasonably seized. Second, Mr. Lund's motion put the issue of unreasonableness as a matter of law at issue, not the issue of reasonableness. The motions must be judged on their own merits. That's standard summary judgment law. Next, Officer Murphy, when she was testifying in her deposition about the color, was not looking at the NIC chart. That is a misrepresentation. She was looking at something called Exhibit 4, which is not in the record. She was not looking at the chart. Next, as to this argument that the unreliability is that we need to look outside the record, that is not true. The record is clear that Officer Murphy knew the tests were unreliable. She testified during her deposition she had been trained that lab tests must be confirmed by a laboratory. Her coworker testified that ISU officers were not allowed to take enforcement action in the absence of a lab test. She made Rule 36 admissions about her own experience with false positives. She made admissions that she knew she was to perform the tests in accordance with the manufacturer's instructions. And then we had Title 15, Regulation 3290F, which states that field tests alone cannot support serious sanctions. The totality of this evidence more than establishes that Officer Murphy knew that the chemical field tests are unreliable. As to taking judicial notice of the amicus brief, that is a Brandeis-style brief that helps with the kind of social science aspect that the court can take judicial notice of those legislative facts. As to the unreasonableness that Judge Johnstone was referring to about the delay, the delay is also exacerbated by the fact that this was deemed a, quote, immediate threat, but yet not acted on for three weeks. Objectively, the jury could find that to be unreasonable. The idea that a Miranda warning was coupled with a coercive segregation, forcing an unconstitutional catch-22 between two competing rights, the right to remain silent and the right to speak. And then finally, as to the jury instruction, deference must have a source, either legislative, like in Bell v. Williams under the ADA, or judicial, like under Turner v. Safley. Neither is present here. And with that, we ask that the summary judgment errors be reversed and that the trial be remanded for a new trial. Thank you. Thank you. We thank both counsel for the briefing and argument. This case is submitted.
judges: GRABER, BRESS, JOHNSTONE